

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

August 17, 2021

<u>**BY CM/ECF & EMAIL**</u>

The Honorable Judith C. McCarthy
United States Magistrate Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

   Re: ***United States v. Darren Lindsay*, 21 Cr. 441 (KMK)**

Dear Judge McCarthy:

 In advance of the bail hearing in this matter on August 19, 2021, the Government respectfully submits this letter opposing defendant Darren Lindsay's bail application, which Judge Karas referred to Your Honor. As explained below, the Government believes there are no conditions or combinations of conditions of release that would reasonable assure the defendant's appearance, or the safety of the community, and that pretrial detention is warranted.

 The above-referenced Indictment charges the defendant and six others in connection with a series of violent armed robberies of suspected drug dealers and drug runners between approximately November 2019 and January 2020. The defendant is charged in all seven counts and was a leader and organizer of the conspiracy, which culminated in the defendant and others robbing a drug runner of approximately $500,000 in drug proceeds in a parking garage in Connecticut, discharing a firearm in the process. As a result, the defendant faces 24 years of mandatory minimum imprisonment. The defendant has two prior felony drug convictions and has served substantial sentences of incarceration. The defendant previously had his parole revoked after he was arrested for committing his second felony offense, and was on parole again at the time of the first robbery charged in the Indictment. He also has out-of-state ties and a strong incentive to flee.

 Accordingly, the Government respectfully asks that the Court order the defendant detained pending trial.

## I.      Applicable Law

Under the Bail Reform Act, pretrial detention is required if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The Indictment here charges the defendant in Counts Three, Five, and Seven with firearms offenses under 18 U.S.C. § 924(c), which together carry a mandatory consecutive potential sentence of 24 years' imprisonment, and for which there is a presumption that "no condition or combination of conditions will reasonably assure the appearance of the person and the safety of the community." 18 U.S.C. § 3142(e)(3)(A). "In a presumption case such as this, a defendant bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). Even if a defendant is able to rebut the presumption, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the . . . court." *Id*. Those factors include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

Ultimately, even in a presumption case, the Government must show "by clear and convincing evidence that the defendant presents a danger to the community and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (internal quotation marks omitted). The Government may meet its burden "by proffer alone." *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) (internal quotation marks omitted). "[B]ail hearings are typically informal affairs, not substitutes for trial or discovery" and so "courts often base detention decisions on hearsay evidence." *United States v. Abuhamra*, 389 F.3d 309, 321 n.7 (2d Cir. 2004) (internal quotation marks omitted).

Finally, where danger is established, courts must be wary of attempting to craft conditions of pretrial release that protect the community. Even the most onerous conditions of pretrial release, up to and including home incarceration, cannot safeguard the community because they cannot guarantee that a defendant will not use phones or other devices to facilitate additional acts of violence. *Mercedes*, 254 F.3d at 436-37 (noting the inadequacy of such conditions to prevent dangerous defendants from posing a threat to their communities); *United States v. Jimenez*, 104 F.3d 354 (2d Cir. 1996) ("We have repeatedly held that bail on conditions similar to those imposed on [defendant], including home detention, does not ensure the safety of the community.") (unpublished). Nor does it guarantee that a defendant will actually comply with a set of imposed conditions. *See, e.g.*, *United States v. Millan*, 4 F.3d 1038, 1049 (2d Cir. 1993) (noting "[h]ome detention and electronic monitoring" largely operate on the "word" of the defendant (internal quotation marks omitted)).

August 17, 2021
Page 3 of 22

## II.     The Defendant Cannot Rebut the Presumption of Dangerousness

The Government respectfully submits that the defendant cannot rebut the presumption of dangerousness, particularly given the nature and circumstances of the offenses, the weight of the evidence against the defendant, and the defendant's history and characteristics. Mostly significantly here, the defendant is charged with conspiring to commit—and  actually committing—multiple violent armed robberies of suspected drug dealers and drug runners, a crime that the Second Circuit has noted "weighs heavily against release" because it "presents a high risk of violence." *Mercedes*, 254 F.3d at 437 (2d Cir. 2001) (defendants charged with armed robbery of drug-dealer). Indeed, the defendant is charged in all seven counts of the Indictment with planning and organizing three separate armed Hobbs Act robberies involving serious acts of violence, including the gunpoint robbery of a suspected drug runner in a parking garage.

### A.     The Nature and Circumstances of the Offenses, and the Weight of the Evidence

First, the presumption of dangerousness is amply supported by the nature and circumstances of the offenses, combined with the compelling weight of the evidence against the defendant for each of the three robberies charged in the Indictment along with the overarching conspiracy. Indeed, an examination of the robbery charged in Counts Six and Seven, and the strength of the Government's evidence for these counts, demonstrates why the statutory presumption applies strongly in favor of detention here.

Specifically, the defendant played a leading role in the armed robbery of a drug runner in a hotel parking garage in Hartford, Connecticut. As a result of that robbery, the defendant and his co-conspirators stole over $500,000 in drug proceeds from the victim, who was violently assaulted in an SUV by the defendant and his co-conspirators. In the lead up to that robbery, the defendant registered a cellular-enabled Apple Watch under his AT&T account. The defendant and his co-conspirators placed that Apple Watch under the bumper of the victim's car in order to track the victim's location. The defendant and his co-conspirators then tailed the victim through Orange County and into Hartford, Connecticut. All of this information is supported by detailed cellsite location data, including for his Apple Watch and the phones of the defendant, his co-conspirators, and the victim.

In the evening of January 18, 2020, after tracking the victim to a hotel parking garage in Hartford, the defendant and co-conspirators Antoine Koen and Onitayo Are traveled back to Middletown, New York, but only after Koen used his handgun to break the back window of the victim's car in search of drug proceeds. Other co-conspirators, including Koen and Indigo Grant, drove back to the Hartford parking garage later that night to stake out the victim's car until the next morning.

August 17, 2021
Page 4 of 22

The next day (January 19, 2020), the defendant, Ontayo Are, and Patricia Konco drove back to the Hartford parking garage for the robbery. Are served as the driver inside the parking garage while the defendant and his co-conspirators grabbed the victim and forced him into their SUV. The defendant was carrying a gun, which discharged twice during the struggle, as corroborated by the two shell casings and a spent bullet that law enforcement found in the parking garage.

As their SUV sped out of the parking garage, the defendant and his co-conspirators held down and violently assaulted the victim, striking him in the face multiple times before obtaining his hotel key, which Indigo Grant later used to retrieve a bag from the victim's hotel room containing approximately $500,000. The victim later reported to law enforcement that he heard his assailants in the SUV discussing whether to let the victim go or to shoot him. Ultimately, the defendant and his co-conspirators drove the victim to a location near New Britain, Connecticut, where they left the victim after stealing his phone and wallet.

The defendant and his co-conspirators then drove back to Middletown, New York, where they met and divided up the proceeds. Not only was this travel again corroborated by cell site location data, but an image from the defendant's private iCloud account show several defendants posing with the stolen drug proceeds that night:



August 17, 2021
Page 5 of 22

Another picture of the defendants celebrating the fruits of their robbery—found on Antoine Koen's cellphone—shows Koen taking the picture with the defendant in the background:



Even more concerning is that the defendant's iCloud account also contains an image of the *victim's driver license*, which was geotagged at a location in Connecticut during the time of the robbery.[1] Toll records further show that the defendant was in constant communication with with his co-conspirators during this time period—exchanging over 300 calls with them between January 18, 2020 and January 20, 2020.

Hospital records show that the victim suffered multiple lacerations, a broken nose, and a concussion. Treating physicians stapled the victim's scalp five times to close his head wound.

---

[1]     The Government has produced in discovery to the defendant and his counsel the evidence underlying the above-described written proffer.

August 17, 2021
Page 6 of 22

Indeed, the defendant's cellphone contains additional evidence of the defendant communicating with co-conspirators regarding the placement of the Apple Watch on the victim's car and the robbery itself. Below are excerpts of the defendant (the 0499 number in green) texting a co-conspirator the day before the robbery:





The defendant had additional text messages with another co-conspirator, in which the defendant said he was in a "waiting game" for the victim:



In the days immediately after the robbery, the defendant continued his text exchange (in green) with the co-conspirator, during which they discussed whether the victim had reported the robbery to the police, splitting up the stolen money, and having things go more smoothly during future robberies:



August 17, 2021
Page 8 of 22



The defendant further texted Indigo Grant ("Sis" in blue) and another co-conspirator in the early morning hours after the robbery about the proceeds from the robbery:



The defendant sent the same message to Antoine Koen (appearing as "Twon" in the defendant's phone):



In sum, there is overwhelming evidence that the defendant organized and participated in a series of armed robberies of suspected drug dealers and drug runners that culminated in a nearly $500,000 heist in or about January 2020. Accordingly, the nature and circumstances of the offenses charged, including crimes involving violence and firearms, combined with the weight of the evidence, counsel strongly in favor of the presumption for pretrial detention.

### B.    The Defendant's History and Characteristics, and the Nature and Seriousness of the Danger Posed by the Defendant's Release

The defendant's history and characteristics similarly underscore both the danger to the community and the flight risk posed by any pretrial release.

First, the defendant's criminal history shows that the defendant, at 30 years old, is a recidivist with a poor record under supervision and two prior convictions for serious drug felonies for which he has served substantial sentences of incarceration. In 2013, the defendant was convicted of Criminal Possession of a Controlled Substance in the Third Degree: Narcotic Drug with Intent to Sell, in violation of New York Penal Law ("NYPL") Section 220.16(01). The defendant was sentenced to three years' imprisonment for that conviction. In 2015, while on parole for his prior drug felony conviction, the defendant was arrested, charged, and convicted of his second felony—Criminal Possession of a Controlled Substance/Narcotic, in violation of NYPL Section 220.16(12). The defendant was sentenced to another term of three years' imprisonment, and his existing parole was revoked.[2] Indeed, the defendant was on parole for his second felony conviction during the first robbery charged in the Indictment

---

[2]     The defendant's criminal history also shows an outstanding traffic warrant from 2011 out of South Carolina, which also speaks to the defendant's unwillingness to abide by court conditions and disrespect for the law.

August 17, 2021
Page 10 of 22

(Counts Two and Three) on or about November 14, 2019.[3] Furthermore, even after two serious felony convictions and very recently ending his second term of state parole, the defendant had no qualms organizing and participating in the violent armed robberies described above and in the Indictment. In fact, as early as October 2019 (while the defendant was on parole), he was texting a co-conspirator about plans to surreptitiously track an individual's location, much like with the Apple Watch used in the January 19, 2020 robbery:



---

August 17, 2021
Page 11 of 22





Second, the defendant—a twice convicted felon—clearly has access to numerous firearms based on a cursory examination of the defendant's private iCloud account (the same iCloud account containing a photograph of the robbery proceeds and the victim's driver license):

August 17, 2021
Page 12 of 22







August 17, 2021
Page 14 of 22



The examples pictured above not only corroborate the defendant's involvement in the charged robberies, they also show the danger the defendant poses to the community and others if granted pretrial release.

Third, text messages between the defendant and Indigo Grant ("Sis") further show a serious risk that the defendant and others could obstruct or attempt to obstruct justice in this case. The defendant was clearly aware of the criminal conduct that he and others engaged in regarding this robbery ring, as well as the Government's investigation. In February 2020, the defendant and Indigo Grant exchanged frantic text messages about the Government's investigation into the robbery ring, expressing concern about potential cooperators:











The above-proffered evidence is certainly not all of the Government's evidence against the defendant, and a bail hearing is not a "mini-trial" or a "discovery tool for the defendant." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). But even this should dispel the notion that the defendant can overcome the presumption of detention in this case, or can be released on conditions that would reasonably assure his appearance or the safety of the community. Nor would the defendant's proposed conditions such as home detention or electronic monitoring do anything to assure the safety of the community from a defendant who took it upon himself to organize and

August 17, 2021
Page 18 of 22

lead the violent armed gunpoint robberies charged in the Indictment. *Jimenez*, 104 F.3d at 354 ("We have repeatedly held that bail on conditions similar to those imposed on [defendant], including home detention, does not ensure the safety of the community."). Given the defendant's track record while under the trust of parole supervision, there is zero reason to believe he will not continue to pose a danger if released in this case.

## III.    The Defendant Poses A Serious Risk of Flight

The defendant here faces a mandatory minimum sentence of 24 years in prison and a statutory maximum of life in a case that, as described above, is supported by powerful evidence including the defendant's own statements in text messages and related photographs. That creates a strong incentive to flee. *See United States v. Williams*, 654 F. App'x 3, 4 (2d Cir. 2016) (summary order) (affirming district court order of detention where the district court found, among other things, "the strength of the evidence against [the defendant] coupled with the significant sentence [the defendant] potentially faced," and "extensive criminal history, parole violations, and engagement in criminal activity while under court-ordered supervision," created a risk of flight).

Additionally, the defendant has out-of-state ties that further highlight the risk of flight. Shortly after the January 19, 2020 robbery, text messages between the defendant (in green) and Indigo Grant ("Sis" in the defendant's phone), indicate that the defendant left New York for South Carolina:







The defendant's text messages contain multiple examples of the defendant refer-
encing going to the "south," as recently as May 2021:



The defendant's repeated references to traveling for periods of time down south,
particularly in the immediate aftermath of the robbery charged in Counts Six and
Seven of the Indictment, provide a telling indication of the defendant's means and
incentive to flee if released.

Finally, the defendant's own text messages show he has no compunction using false
information to conceal his involvement in illegal activity, which further demonstrates
the defendant's willingness and capability to flee. For example, below is a text ex-
change between the defendant ("D Dollars") and another individual expressing con-
cern about the recent publication of Paycheck Protection Program loans in which the
defendant states he provided a fake address:

August 17, 2021
Page 20 of 22





The defendant is also apparently acutely aware of the consequences of federal charges, as expressed to co-defendant Indigo Grant ("Sis") in text messages on the day several individuals known to the defendants were arrested last summer:

August 17, 2021
Page 21 of 22



As the defendant himself stated later in that text exchange with Indigo Grant, "Hobbs act an[d] conspiracy is a wrap," and opined that it would result in a sentence of at least ten years:



Accordingly, the defendant's significant mandatory minimum sentence if convicted, combined with his track record and the conduct described in the above text messages, shows a serious risk of flight. The Court can and should detain the defendant pending trial on those grounds alone.

August 17, 2021
Page 22 of 22

## V.    Conclusion

   For the reasons stated above, the Court should deny the defendant's bail application and order the defendant detained pending trial.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By:_____/s/_____
Nicholas S. Bradley / Jennifer N. Ong
Assistant United States Attorneys
Southern District of New York
(914) 993-1962 / -1926

cc:    All Counsel of Record (by CM/ECF)
       Pretrial Services (by email)